# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 8:05CR274 |
| vs. | ) | |
| | ) | REPORT AND |
| ELIGIO GONZALEZ-NOYOLA, | ) | RECOMMENDATION |
| | ) | |
| Defendant. | ) | |

This case is before the court on the MOTION TO SUPPRESS (#68) filed by defendant, Eligio Gonzalez-Noyola ("Gonzalez-Noyola"). The motion was heard on February 21 and March 8, 2006. The Transcript (#80) of the February 21, 2006 hearing was filed March 2, 2006 and the Transcript (#84) of the March 8, 2006 hearing was filed March 24, 2006. The motion was deemed submitted at the end of the briefing schedule, on May 3, 2006 (*see* #88).

Gonzalez-Noyola moves the court for the suppression of evidence and statements obtained following a stop on May 30, 2005. Specifically, he alleges the Omaha police did not have probable cause to stop his vehicle, detain him, or to search his person or vehicle; that his statements were obtained in violation of his right against self incrimination; and that the search of his residence violated his right to be secure from unreasonable searches and seizures.

The government alleges that the stop and arrest of Gonzalez-Noyola occurred with probable cause, that his statements were made after *Miranda* warnings, and that the search of his residence occurred after he executed a written permission to search form.

## STATEMENT OF FACTS

Mark Lang testified he is a 20-year employee of the Omaha Police Department currently assigned to the narcotics unit. On May 18, 2005, he arranged with a cooperating witness ("CW"), who identified her drug source as a Hispanic male she knew only as Harley, to make a telephone contact with Harley and arrange for the purchase of methamphetamine (#80, 8:24-9:14). As a result of the call, Harley delivered a quarter pound of methamphetamine to the residence of the CW and the transaction was recorded by the police using a video camera (#80, 10:3-16). Based on his observations, Lang identified Harley as the defendant, Gonzalez-Noyola (#80, 12:3-9).

Lang testified that on May 20, 2005 the CW, in the presence of law enforcement, again called Harley and arranged a second meeting so the CW could pay money towards the methamphetamine delivered on May 18. Under the surveillance of narcotics officers, the CW met Gonzalez-Noyola in the area of 36th and Leavenworth where Gonzalez-Noyola entered the CW's vehicle and was given $1,500. The CW then drove Gonzalez-Noyola to a residence south of Leavenworth Street on 33rd where he exited the vehicle (#80, 13:1-25).

Lang testified that on May 24, 2005 the CW, in the presence of law enforcement officers, called Gonzalez-Noyola a third time and indicated that she wanted to make an additional payment of $2,100 on the methamphetamine. Following the call, Gonzalez-Noyola arrived at the CW's residence and exchanged $2,100 for additional methamphetamine (#80, 14:10-15:2). Again, the exchange was observed and recorded (#80, 15:25-16:5). During the meeting, Lang watched as Gonzalez-Noyola and a third party, codefendant Rosio

Cruz, entered the dining room, where Cruz removed a quarter pound of methamphetamine from her purse and gave it to Gonzalez-Noyola. Gonzalez-Noyola then handed the methamphetamine to the CW (#80, 15:17-24).

Lang testified that on May 30, 2005 the CW, in the presence of law enforcement, contacted Gonzalez-Noyola for a fourth time and arranged a meeting at which the CW would pay money towards the previously received methamphetamine and receive additional methamphetamine (#80, 17:1-12). Following the call, Gonzalez-Noyola arrived at the CW's residence and again exchanged methamphetamine for money. Again, the call and transaction were recorded. After the transaction, surveillance officers followed Gonzalez-Noyola as he drove a reddish-maroon Volkswagen from the residence. They stopped him approximately 2½ miles away in the parking lot of the Target store at 360 North Saddle Creek (#80, 19:18-20:8).

Lang testified on cross-examination that all of the exchanges between the CW and Gonzalez-Noyola that occurred in the CW's residence were videotaped. He and other officers were in another room of the residence where they observed a live feed (#80, 35:17-23), and he observed Gonzalez-Noyola on all three occasions.

Lang testified that when he arrived at the Target parking lot, he observed officers standing near Gonzalez-Noyola and his vehicle and that Gonzalez-Noyola was handcuffed. Lang contacted Gonzalez-Noyola and placed him in the front seat of a patrol car (#80, 21:4-11). Lang then spoke with Sgt. Greg Gonzalez about how the investigation should

proceed regarding two addresses which had been previously identified as connected to Gonzalez-Noyola (#80, 21:20-22:3).

Lang testified that he then returned to the patrol car and read Gonzalez-Noyola his *Miranda* rights in English using a *Miranda* warning card (Ex. 1). He asked Gonzalez-Noyola to give him yes or no response to each question, and that Gonzalez-Noyola responded affirmatively or yes to each question (#80, 23:10-24). Lang spoke to Gonzalez-Noyola only in English, noting that Gonzalez-Noyola never said that he did not understand. While Lang did not consider Gonzalez-Noyola fluent in English, he felt he was fluent enough to understand (#80, 23:25-24:14).

Lang testified that after Gonzalez-Noyola was advised of his rights, they had a conversation during which Lang made no promises, nor did he threaten Gonzalez-Noyola (#80, 25:5-12). Lang admitted that during the conversation Gonzalez-Noyola was handcuffed (#80, 25:25-26:2) and that Sgt. Gonzalez was standing and listening just outside the driver's door with the driver's window down (#80, 26:6-12). During the 10-15 minute conversation, Gonzalez-Noyola made incriminating statements about narcotics trafficking (#80, 26:21-24; 26:25-27:3).

Lang testified that Gonzalez-Noyola admitted he lived at 112 North 34th Avenue, Apartment #4, and that additional amounts of methamphetamine would be found there. Lang asked Gonzalez-Noyola if he would consent to a search of the apartment and Gonzalez-Noyola indicated he would cooperate and consent. Lang then secured a Spanish language permission to search form that is used by the Omaha police (Ex. 2) (#80, 28:8-20) and

showed it to Gonzalez-Noyola. He directed Gonzalez-Noyola to read the form. Gonzalez-Noyola read the form (#80, 29:13-23) asked no questions before signing the form (#80, 30:10-15). Lang denied on cross-examination that he ever told Gonzalez-Noyola he could benefit by cooperating, that it would go easier on him if he helped, that his child was going to be taken, or that it would go easier on his wife if he cooperated (#80, 51:5-16).

Lang testified that he and Gonzalez-Noyola then went to 112 North 34th Street, Apt. 4, which Lang entered using Gonzalez-Noyola's key (#80, 31:1-6). After securing the apartment, Gonzalez-Noyola entered (#80, 31:20-25) and indicated that there were two ounces of methamphetamine in the pocket of a shirt hanging in the west bedroom (#80, 32:11-17). Lang went to the bedroom and located what appeared to be two ounces of methamphetamine (#80, 32:18-22).

On cross-examination Lang again testified that he went through each *Miranda* warning. Gonzalez-Noyola answered yes to each question and indicated he was willing to speak (#80, 46:5-7). Lang noted that Gonzalez-Noyola's responses were in English, although somewhat broken (#80, 46:20-24); however, if he had felt Gonzalez-Noyola did not understand a particular *Miranda* warning, he would have solicited the help of Sgt. Gonzalez who was only a few feet away (#80, 48:2-8), and who is fluent in Spanish (#80, 26:18). Lang admitted that after the *Miranda* warnings, Sgt. Gonzalez did speak to Gonzalez-Noyola in Spanish (#80, 48:9-16). On redirect examination Lang testified that Gonzalez-Noyola never indicated that he no longer wanted to talk or that he wanted a lawyer (#80, 60:18-61:2).

On cross examination Lang admitted that in filling out the permission to search form (Ex. 2), he did not fill in the supplemental section indicating which officers witnessed the signature, explaining that while Sgt. Gonzalez and four or five officers were nearby, he wasn't going to put down everybody's name (#80, 52:10-21). Lang admitted he never asked Gonzalez-Noyola if he could read English or Spanish (#80, 54:11-13).

Eligio Gonzalez-Noyola testified that he first saw Lang about 15 to 20 minutes after he was arrested in the Target parking lot (#80, 62:8-14).[1] Prior to that, he had contact only with Sgt. Gonzalez who talked to him in Spanish and told him to tell the truth – otherwise they would take his daughter away from him and his wife would go to jail (#80, 63:3-14). He stated Sgt. Gonzalez asked him if he wanted to cooperate and told him if he did he could help his wife, and they would not take his daughter away (#80, 63:14-17). He stated that Gonzalez informed him that another officer was going to arrive to conduct the investigation and Gonzalez-Noyola should tell that officer the truth and cooperate, and if he did, they would let his wife go free and wouldn't take his daughter (#80, 63:22-64:3).

Gonzalez-Noyola testified that when Lang arrived, Lang placed him in the front seat of a patrol car and asked him his name, that Lang had in his hands the drugs Gonzalez-Noyola had delivered earlier and Lang asked if the drugs were his. Gonzalez-Noyola stated

---

[1]Lang testified on cross examination that he was not sure how much time passed from the stop at the Target parking lot until he left the CW's residence; however, he estimated it took four to five minutes from the time he left the residence until he reached the parking lot (#80, 54:19-55:5).

that he didn't understand anything, that he just understood he was being shown the drugs (#80, 64:16-23; 70:22-71:2).

Gonzalez-Noyola testified his educational level is middle school, that his wife speaks only Spanish, and that he is able to understand about 45% of English conversations (#80, 64:24-65:11). He denied hearing anything about being able to hire a lawyer, to wait to have a lawyer present before he spoke, or that he had a right to a lawyer (#80, 65:12-19). Gonzalez-Noyola did remember being shown the permission to search form (Ex. 2) and signing it; however, his recollection is that he signed it inside his house, not in or near the patrol car (#80, 66:13-23). He denied reading the form prior to signing, stating that Lang did not tell him to read it (#80, 66:22-67:2). He also noted that when he signed the form in his apartment law officers were already searching, that everything happened at the same time, that the form was never explained, and that he signed only because he was frightened and told to sign (#80, 69:20-23).

On cross-examination, Gonzalez-Noyola admitted that he is capable of reading the Spanish permission to search form (Ex. 2) (#80, 75:21-25).

Gonzalez-Noyola stated that after his arrest, Lang asked him about an individual known as Gueto, who lived across the street from the church, and that he told Lang that he did not know Gueto. Lang later took him to a house across the street from a church and asked him if he knew the person who lived in the house. Again he told Lang "no" (#80, 71:14-72:8). Gonzalez-Noyola admitted that he told Lang about David Banos, his cousin who worked at the Macaroni Grill, but he denied telling Lang that Banos was involved in

selling drugs. He denied however bringing up Banos' name (#80, 72:9-21). Gonzalez-Noyola testified, "right now, to be quite sincere, I'm simply answering that he's my cousin. He at no time made any mention of David, and no time did I tell him anything about David, and now I'm hearing that he's being mentioned, and I'm saying that he's my cousin, yes, do I know him? Yes. I can't deny that" (#80, 73:6-14). After a brief recess, Gonzalez-Noyola testified that during the May 30 conversation with Lang the name David Banos was never mentioned by him or by Lang (#80, 74:19-75:2).

After being recalled, Ofc. Lang testified on rebuttal that Gonzalez-Noyola signed the Spanish permission to search form (Ex. 2), outside the patrol car in the Target parking lot (#80, 81:22-82:4).

Lang also testified that David Banos was first mentioned by Gonzalez-Noyola, that a reference to the name is in Lang's information report which was sent to the typist on May 31, and that prior to May 30 he did not know the name David Banos (#80, 83:1-14). Lang also stated that Gonzalez-Noyola gave him the names of Gueto and Kevin as persons with whom Gonzalez-Noyola dealt narcotics (#80, 83:16-22) and that prior to Gueto's name being brought up, the name did not mean anything (#80, 83:25-84:4). However, based on Gonzalez-Noyola's description of Gueto's residence, Lang concluded that Gueto was a person named William Wilbanks (#80, 84:6-15). Gonzalez-Noyola also described Kevin as Honduran, and gave a location where Kevin lived. All the names were given to Lang during his interview with Gonzalez-Noyola which was conducted in English (#80, 84:24-85:4).

Lang testified that he gave the permission to search form (Ex. 2), to Gonzalez-Noyola while they were in the patrol vehicle, that Gonzalez-Noyola read the form and indicated that he understood it. Lang then removed Gonzalez-Noyola from the vehicle to an area near the hood, removed the handcuffs, and Gonzalez-Noyola signed the form in two places (#80, 85:5-17).

Lang testified that he did advise Gonzalez-Noyola of his rights using a *Miranda* card (Ex. 1) and that he received an affirmative response to each question (#80, 86:3-8). Lang again denied that he threatened Gonzalez-Noyola, that he told him that his wife would be arrested if he did not speak with the officers, or that he made any threat or promise about his child (#80, 86:11-17).

Sergeant Greg Gonzalez also testified as a rebuttal witness. He is an 11-year employee of the Omaha Police Department, currently assigned as a narcotics supervisor. On May 30, 2005 he was informed by Lang that law enforcement was setting up a buy in which a confidential witness was going to meet with Gonzalez-Noyola to pay for previously purchased drugs and attempt to purchase additional drugs (#84, 5:1-7).

Gonzalez testified that after he arrived at the residence of the CW, Gonzalez-Noyola arrived and a short time later left the residence. Law enforcement then followed Gonzalez-Noyola's Volkswagen to the north parking lot of the Target store near Saddle Creek and Cuming, where a traffic stop was conducted and Gonzalez-Noyola was arrested (#84, 6:3-21). When Sgt. Gonzalez arrived at the scene of the arrest, he had no conversations with Gonzalez-Noyola until Officer Lang arrived (#84, 6:24-7:5). Gonzalez specifically denied

ever telling Gonzalez-Noyola that he had to cooperate or his girlfriend was going to be arrested, or that if he did not cooperate authorities were going to take his child (#84, 7:13-21).

Gonzalez testified that within a couple of minutes of his arrival at the parking lot, Lang arrived (#84, 7:6-12), and Lang and Gonzalez-Noyola had a conversation in an unmarked police vehicle. As the conversation occurred, Sgt. Gonzalez stood outside the driver's side window, but within earshot (#84, 8:2-11). Gonzalez heard Lang advise Gonzalez-Noyola of his *Miranda* rights and he heard Lang speak with Gonzalez-Noyola (#84, 8:12-17). In his opinion, Lang and Gonzalez-Noyola were communicating effectively in English (#84, 8:22-25). As to the defendant's ability to understand English, Sgt. Gonzalez observed on cross-examination that "we knew through source information, through the video and Officer Quaites who had stopped him initially, that he spoke fine English and so I didn't need to at that point." (#84, 11:18-21).

Sergeant Gonzalez admitted that after Lang produced the Spanish permission to search form, that he followed up in Spanish, as a "safety measure," asking Gonzalez-Noyola if he could read Spanish. After Gonzalez-Noyola responded that he could read the form, Gonzalez told him to read the form and if he had any questions to let him know. Gonzalez-Noyola then read the form and signed it (#84, 9:10-21; 12:1).

Gonzalez testified that Gonzalez-Noyola never said in Spanish or English that he did not want to talk with the officers or that he wanted a lawyer (#84, 10:10-19). Gonzalez noted that neither he nor anyone else threatened to arrest Gonzalez-Noyola's wife or to take his

-10-

child (#84, 10:20-24), nor did they ever mention that cooperating with the police would help resolve the case. To the contrary, Sgt. Gonzalez testified he explained to Gonzalez-Noyola that his wife was, in fact, going to be arrested (#84, 11:5-15).

Gonzalez testified that, based on his conversations with Gonzalez-Noyola and having overheard him in conversations with others, he believed Gonzalez-Noyola fully understood English, but that he did not know if he was "fluent." (#84, 16:18-23).

## LEGAL ANALYSIS

### A. Probable Cause

Gonzalez-Noyola complains that the officers who arrested him did not have probable cause to do so because they did not personally observe him commit any criminal act; the drug trafficking episodes providing the basis for the arrest were observed by Officer Lang, who was not physically present when Gonzalez-Noyola was initially detained and arrested in the Target parking lot. Nor was Gonzalez-Noyola stopped for a traffic violation.

Although there was no traffic violation to provide a basis for stopping Gonzalez-Noyola's vehicle, "[p]olice officers may make warrantless arrests when they have probable cause to believe a person has committed a felony." *United States v. Travis*, 993 F.2d 1316, 1323 (8th Cir.), *cert. denied*, 510 U.S. 889 (1993) (citing *United States v. Watson*, 423 U.S. 411 (1976)); Neb. Rev. Stat. § 29-404.02(1). "Probable cause exists when officers possess information that would 'warrant a prudent man in believing that the [suspect] had committed or was committing an offense.'" *Id*. (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)). "In

-11-

making this determination, the court may consider the collective knowledge of all officers involved." *United States v. Morgan*, 997 F.2d 433, 435 (8th Cir. 1993).

Considering the collective knowledge of all officers involved, which would include that of Officer Lang, the court finds that the officers had probable cause to stop and arrest Gonzalez-Noyola on suspicion of felony drug offenses.

**B.** *Miranda* **Warnings**

Gonzalez-Noyola was under arrest and in police custody when his statements were made. The protections of *Miranda v. Arizona*, 384 U.S. 436 (1966), are triggered when a defendant is both in custody and being interrogated. *Unites States v. Lawrence*, 952 F.2d 1034, 1036 (8th Cir.), *cert. denied*, 503 U.S. 1011 (1992).

Contrary to his assertions, the record shows that Gonzalez-Noyola was, in fact, advised of his *Miranda* rights in English before any questioning began. Gonzalez-Noyola argues, in turn, that he did not understand his rights, if given, because he is not fluent in English. On this topic, the testimony of Ofc. Lang and Sgt. Gonzalez is in substantial conflict with that of the defendant.

I credit Officer Lang's testimony that he read Gonzalez-Noyola his *Miranda* rights in English using a *Miranda* warning card (Ex. 1), and that Gonzalez-Noyola responded affirmatively, or yes, in "somewhat broken" English, to each question on the card and did not ever say he did not understand. I also credit Sgt. Gonzalez' opinion that Lang and Gonzalez-Noyola were communicating effectively in English, based on the sergeant's testimony that

he heard Lang advise Gonzalez-Noyola of his *Miranda* rights and heard Lang speak with Gonzalez-Noyola.

I find that the officers' testimony is more credible than that of the defendant on these issues. I find that the Gonzalez-Noyola was given his *Miranda* rights by Officer Lang, that he understood his rights, and, knowing his rights, agreed to talk to Officer Lang without an attorney present.

### C. Consent to Search

Gonzalez-Noyola also contends that the warrantless search of his residence violated his right to be secure from unreasonable searches and seizures.[2]

The Fourth Amendment protects people from unreasonable searches of their "persons, houses, papers and effects." U.S. Const. amend. IV. A warrantless search of a house is presumptively unreasonable. *Payton v. New York*, 445 U.S. 573, 586 (1980), and absent exigency or consent, warrantless entry into the home is impermissible under the Fourth Amendment. *Steagald v. United States*, 451 U.S. 204, 211-212 (1981). Police may conduct a search of someone's home, even without a warrant or probable cause, if that person voluntarily consents to the search. *See United States v. Chaidez*, 906 F.2d 377, 380 (8th Cir. 1990); *United States v. Bradley*, 234 F.3d 363, 366 (8th Cir. 2000); *see also United States v.*

---

[2]In his post-hearing brief (#95), Gonzalez-Noyola argues that the Spanish language consent form (Ex. 2) did not constitute an accurate or coherent translation of the English version of the form. That argument was not raised at any time during the two-part evidentiary hearing. For that reason, I decline to consider the new "evidence" belatedly attached to Gonzalez-Noyola's post-hearing brief, particularly in light of Gonzalez-Noyola's admission that he is capable of reading the Spanish permission to search form.

*Deanda*, 73 F.3d 825 (8th Cir. 1996). To determine whether a consent is voluntary, the court must examine the totality of the circumstances, including the characteristics of the accused and the nature of the encounter. *See Bradley*, 234 F.3d at 366. The government has the burden of proving the consent was voluntary. *United States v. Parris*, 17 F.3d 227, 229 (8th Cir.), *cert. denied*, 51 U.S. 1077 (1994); *United States v. Heath*, 58 F.3d at 1275. "The prosecution need not prove that the individual is fully aware of his or her rights under the Fourth Amendment in order to establish a voluntary consent." *Heath*, 58 F.3d at 1275 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 235 (1973)).

I credit Ofc. Lang's testimony that he told Gonzalez-Noyola that he had a Spanish-language permission to search form, had Gonzalez-Noyola read the form, and that Gonzalez-Noyola did read or appeared to read the form. Gonzalez-Noyola then signed the top portion of the form (showing the party in control of 112 North 34th Street, Apartment 4) and the bottom portion of the form "where it, essentially, indicates that I have the right to deny officers basically permission to search my residence." (#80, 29:15-23). Sergeant Gonzalez followed up in Spanish, as a "safety measure." Based on the officers' testimony, which I find to be credible, I find that the defendant knew he was being asked for permission to search his residence and knew that he could refuse to give them permission to search. Knowing these rights, Gonzalez-Noyola signed the form and gave the officers permission to search his residence.

Turning to the issue of voluntariness, there is no evidence showing that the defendant's will was overborne, or that he was coerced, deceived, or promised anything in

return for signing the consent form. *See United States v. Syslo*, 303 F.3d 860, 865-66 (8th Cir. 2002) (To determine whether a waiver was voluntary, the court considers the totality of the circumstances and must determine whether the individual's will was overborne.).

I find that Gonzalez-Noyola voluntarily consented, in writing, to the search of his residence.

**RECOMMENDATION**

In summary, the officers had probable cause to arrest Gonzalez-Noyola without a warrant on suspicion of felony drug trafficking offenses. Gonzalez-Noyola was given, understood, and voluntarily waived his *Miranda* rights. Gonzalez-Noyola voluntarily consented, in writing, to the search of his residence. For these reasons,

**IT IS RECOMMENDED** that defendant's MOTION TO SUPPRESS (#68) be denied in its entirety.

Pursuant to NECrimR 57.3, a party may object to this Report and Recommendation by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten (10) days after being served with the recommendation. The statement of objection shall specify those portions of the recommendation to which the party objects and the basis of the objection. The objecting party shall file contemporaneously with the statement of objection a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.

**DATED May 9, 2006.**

        **BY THE COURT:**

        **s/ F.A. Gossett**
        **United States Magistrate Judge**